Filed 5/29/15  Marriage of Osborn & Musalman CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re the Marriage of JULIE ANN OSBORN and MILES MUSALMAN. | D065329 |
| JULIE ANN OSBORN, | |
| Appellant, | (Super. Ct. No. D515334) |
| v. | |
| MILES MUSALMAN, | |
| Respondent. | |

APPEAL from an order of the Superior Court of San Diego County,

Susan D. Huguenor, Judge.  (Retired judge of the San Diego Sup. Ct.)  Reversed and

remanded for further proceedings.

Julie Ann Osborn, in pro. per., for Appellant.

Miles Musalman, in pro. per., for Respondent.


Julie Ann Osborn appeals from an order denying her request to invalidate or

modify various provisions in her marital settlement agreement (MSA) with Miles

Musalman.  Osborn argues the trial court erred in affirming provisions in the MSA diverting child support funds to a college fund, giving Musalman a credit against child support, providing that neither party had an obligation to keep the other informed of financial conditions, and setting the parties' child custody time share percentages for the purpose of child support.  Osborn also argues the MSA is unfair overall because it shifts the responsibility for raising the parties' children entirely to her.  We agree with Osborn that the provisions in the MSA diverting child support funds to a college fund and giving Musalman a credit against child support are contrary to law.  Accordingly, we remand the matter for further proceedings.  In all other respects, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Osborn and Musalman were married in 2000 and separated in 2007.  They had two children together, one born in 2004 and the other in 2008.  Osborn and Musalman entered into the MSA, which was incorporated into a judgment of dissolution.

The MSA gave primary physical custody of the children to Osborn and allowed her to move them to Arizona with her.  Osborn and Musalman agreed that for purposes of child support, Osborn had a 70 percent time share percentage and Musalman had 30 percent.  The MSA further provided:

> "[Musalman] shall be granted a credit in the amount of $16,500.00 to be applied toward child support payments starting with a credit to the earliest payment due.  After the credit has been exhausted, all child support payments will be deposited into a bank or brokerage account for the benefit of [the children].  The account will hold the proceeds for [the children's] college education costs as well as payment for the purchase of their first automobiles.  The account shall be administered by Phil Osborn, the children's maternal grandfather, as the trustee for as long as he is able. . . .  Neither

2

>[party] shall be permitted to make withdrawals for their individual benefit from this account. In the event neither child attends college and the trust account established by the parties contains any funds, then 1/3 of the principal and income shall be distributed to the children when they reach the respective ages of 21, 23, and 25."

The MSA does not explain the reason for the $16,500 credit; however, Musalman stated in his income and expense declaration that he had "a $16,500 credit with [Osborn] in lieu of legal cost reimbursement for a TRO hearing that [Osborn] brought forth. Child support payments have been used, as per the MSA, to reduce the credit."

In the MSA, Osborn and Musalman agreed that Musalman would claim their youngest child as a dependent on his income tax returns while Osborn would claim their oldest child as a dependent. Osborn and Musalman further agreed that "[n]either party shall have any duty or obligation to keep the other informed of their respective incomes, jobs or any financial situation."

Osborn moved to increase Musalman's child support payments and to invalidate or modify various provisions of the MSA. The trial court granted Osborn's request to modify child support but declined to invalidate portions of the MSA. Specifically, the court did not find the MSA's provision regarding the deposit of child support payments into a restricted account for college and automobile funds as void against public policy. Rather, the court stated, that provision "does not restrict the Court's jurisdiction on child support, but in fact reinforces the children's right to their support and insures that all support paid will be used for their benefit only." The court also affirmed the $16,500 credit by stating the new child support order would begin after the credit was exhausted. Lastly, the court affirmed the paragraph in the MSA regarding dependents on the parties'

3

tax returns and stating neither party had a duty to keep the other informed of their financial conditions.

## DISCUSSION

### I. *Standard of Review*

"Child support awards are reviewed under an abuse of discretion standard. [Citations.] We cannot substitute our judgment for that of the trial court, but only determine if any judge reasonably could have made such an order. [Citation.] Our review of factual findings is limited to a determination of whether there is any substantial evidence to support the trial court's conclusions. [Citation.]" (*In re Marriage of Chandler* (1997) 60 Cal.App.4th 124, 128 (*Chandler*).)

"'We observe, however, that the trial court has "a duty to exercise an informed and considered discretion with respect to the [parent's child] support obligation . . . ." [Citation.] Furthermore, "in reviewing child support orders we must also recognize that determination of a child support obligation is a highly regulated area of the law, and the only discretion a trial court possesses is the discretion provided by statute or rule . . . ." [Citation.] In short, the trial court's discretion is not so broad that it "may ignore or contravene the purposes of the law regarding . . . child support. . . ." [Citation.]'" (*In re Marriage of Pearlstein* (2006) 137 Cal.App.4th 1361, 1371-1372.) When a child support agreement is incorporated in a child support order, the obligation created is deemed court-imposed rather than contractual. (*Armstrong v. Armstrong* (1976) 15 Cal.3d 942, 947.)

4

## II. *Child Support Account*

Osborn argues the trial court erred in affirming the provision in the MSA diverting child support funds to an account for the children's college and automobile expenses. We agree.

In *Chandler*, *supra*, 60 Cal.App.4th at pp. 128-130, the appellate court held the trial court abused its discretion in establishing a trust that allowed surplus child support to be saved for the child's college and other expenses. The trust placed restrictions on use of the funds, and the mother's use of the funds required the father's written permission or a court order. (*Id.* at p. 128.) The *Chandler* court found that "[o]nce the court determines the appropriate amount of child support, the supporting parent has no right to determine whether these funds are used to buy groceries, pay rent or pay for music lessons." (*Id.* at p. 130.) The court emphasized that absent special circumstances, a trial court could not order a parent to support an adult child through payments of college expenses. (*Ibid.*) "Thus, the trial court had no authority to create a fund to meet some unexpected contingency at some indefinite time in the future or to provide for [the child] when she becomes an adult." (*Ibid.*) "[E]ven assuming a trust can be used, it must be limited to cases where there is a strong showing of necessity, buttressed by specific, detailed factual findings compelling the need to limit access to support funds." (*Id.* at p. 128.)

Here, the MSA called for Musalman to deposit his child support payments into a trust account. Those funds were earmarked for the children's future college and automobile expenses. Further, the MSA did not allow for Osborn to withdraw any of the funds for the children's immediate support and needs and there is no indication that

5

Musalman was paying other child support amounts. "A child support order need not, and generally should not, earmark specific amounts for certain purposes." (*In re Marriage of Cryer* (2011) 198 Cal.App.4th 1039, 1051.)

Musalman's support payments were directed at future contingencies that may not be realized and, even if they are, those contingencies would largely occur when the children are adults attending college. Included in the many purposes of child support is that children receive "fair, timely, and sufficient support" and share in the standard of living of both parents. (Fam. Code, § 4053, subds. (a),(f), (l); undesignated statutory references are to this code.) This requires both parents to contribute to the support of their children when they are minors and provide for their immediate needs.

Even if a trust in this case was appropriate, Musalman did not make a strong showing of necessity and the trial court did not make specific, detailed factual findings compelling the need to limit access to support funds. (*Chandler*, *supra*, 60 Cal.App.4th at p. 128.) Absent such findings, the trial court abused its discretion in creating a trust restricting use of Musalman's child support payments for the children's college and automobile expenses.

### III.  *Credit to Offset Debt*

Osborn argues the trial court erred in affirming a provision in the MSA giving Musalman a credit against child support. We agree.

We begin with the fundamental and well-established principle that the child support obligation is owed to the child, not the parent who receives child support payments. (See *In re Marriage of Armato* (2001) 88 Cal.App.4th 1030, 1039; *Williams v.*

6

*Williams* (1970) 8 Cal.App.3d 636, 640; *In re Marriage of Stutz* (1981) 126 Cal.App.3d 1038, 1041-1042.)  Thus, "a child support obligation *cannot* be satisfied through the obligor parent's performance of an entirely *different* (independent) obligation." (Hogoboom & King, Cal. Practice Guide:  Family Law (The Rutter Group 2014) ¶ 6:628, p. 6-244 (rev. #1, 2011).)  In *In re Marriage of Armato*, *supra*, at p. 1039, the obligor parent attempted to reduce his child support obligation on the grounds that he had assumed a business debt of the supported parent and the debt turned out to be far larger and more onerous than the parties had expected.  The court rejected the father's attempt to get a credit against his child support obligation for the business loss, noting that the child support obligation is owed to the child not the parent.  (*Ibid*.)  In *Williams v. Williams*, *supra*, at pp. 639-640, the court rejected a similar attempt to reduce a support obligation by the amount the supporting parent had advanced in maintaining an investment the parties jointly owned.  Likewise, in *In re Marriage of Stutz*, *supra*, at pp. 1041-1042, the court refused to give a supporting spouse credit for mortgage payments which were required as part of the parties' property distribution.

Here, the family court stated Musalman's new child support obligations would "begin after the credit of the $16,500 is complete and exhausted."  The record indicates the credit was for amounts owed by Osborn to Musalman for legal costs related to a restraining order hearing.  Thus, the credit was for an independent debt owed by Osborn. Child support payments are owed to the children, not the parent who receives the payments.  Thus, the parties could not use child support to satisfy an unrelated debt between them.

7

IV. *Information Regarding Financial Conditions*

Osborn argues the trial court erred in affirming the provision in the MSA providing that "[n]either party shall have any duty or obligation to keep the other informed of their respective incomes, jobs or any financial situation." Specifically, she contends the provision is contrary to section 3664. We reject this argument.

Section 3664 provides that "[a]t any time following a judgment of dissolution of marriage . . . that provides for payment of support, either the party ordered to pay support or the party to whom support was ordered to be paid or that party's assignee, without leave of court, may serve a request on the other party for the production of a completed current income and expense declaration in the form adopted by the Judicial Council."

Nothing in the MSA prevents Osborn from seeking an income and expense declaration from Musalman pursuant to section 3664. Rather, the MSA merely provides that Musalman does not have an independent duty, absent a request under section 3664, to keep Osborn informed of his income, job or financial situation on an ongoing basis. Thus, the MSA is not contrary to section 3664.

V. *Child Custody Time Share Percentages*

Osborn argues the trial court erred in affirming a provision in the MSA setting the parties' child custody time share percentages for the purpose of child support as those percentages do not reflect the actual amount of time the children spend with each parent.

"'In California there is a "statewide uniform guideline for determining child support orders." (Fam. Code, § 4055, subd. (a).) This guideline is an algebraic formula. (*Ibid.*)'" (*In re Marriage of Katzberg* (2001) 88 Cal.App.4th 974, 979.) The guideline

8

formula is based on each parent's income and a time sharing adjustment for shared physical responsibility for the children. (§ 4055, subds. (a) & (b).) For calculating child support, a parent's share is based on the approximate amount of time in which the parent has actual, physical responsibility for the child. (*In re Marriage of Katzberg*, *supra*, at p. 981.) We review the trial court's determination of the parties' time share percentages for an abuse of discretion. (*Id.* at p. 977 [the time share calculation is one "area in which a trial court retains some discretion"].)

Here, the parties agreed in the MSA that for purposes of child support, their "time share percentage shall be deemed 70 percent to [Osborn] and 30 percent to Musalman." The parties also agreed that Osborn could move the children to Arizona with her. Osborn sought to decrease Musalman's time share percentage to five percent based on his actual visitation with the children over the last two years. Musalman claimed that five percent was not appropriate because Osborn did not make the children available for his visits or otherwise impeded visitation.

In calculating child support, the trial court used 30 percent as Musalman's time share. The record before us is not clear as to the actual time each party had physical responsibility for the children. We presume the order appealed from is correct and "'all intendments and presumptions are indulged to support the order on matters to which the record is silent. It is appellant's burden to affirmatively demonstrate error and, where the evidence is in conflict, [we] will not disturb the trial court's findings. [Citations.]' [Citation.]" (*Cochran v. Rubens* (1996) 42 Cal.App.4th 481, 486.) Moreover, all factual matters are to be viewed most favorably to the prevailing party and in support of the

9

order; all issues of credibility are for the trier of fact. (*Nestle v. City of Santa Monica* (1972) 6 Cal.3d 920, 925.) On the record before us, we cannot conclude the trial court abused its discretion in utilizing a 30 percent time share for Musalman in calculating child support.

## VI. *Overall Fairness of MSA*

Osborn asserts a catchall argument that the MSA is unfair overall because it shifts the responsibility for raising the parties' children entirely to her. In her argument, she asserts that provisions in the MSA concerning the child support credit, college fund account, lack of a requirement to keep the other party informed of financial conditions, dependent claims on tax returns, time share percentages, and payment of healthcare expenses make the MSA unfair on its face. We reject this overly broad argument.

Osborn entered into the MSA in which she "acknowledge[d] that the support provisions set forth in th[e] Agreement may or may not be comparable to what a court of law might provide were the matter fully investigated and litigated." Further, "[e]ach party enter[ed] into th[e] Agreement freely and voluntarily, with full knowledge" and both parties were represented by counsel in the negotiation and preparation of the MSA. Osborn admitted that she conceded many things in the MSA in order to move the children to Arizona with her. On this record, absent a showing that Osborn's consent to the MSA was obtained through duress, menace, fraud, undue influence or mistake (see Civil Code, §§ 1566-1579), we decline to find the MSA was unfair on its face as it appears it was freely bargained for and negotiated.

10

DISPOSITION

The matter is remanded to the trial court to enter a new order on child support that does not employ a trust account unless the court makes detailed factual findings to support the need for a trust.  Additionally, the new child support order shall not include a credit for satisfaction of an independent obligation.  In all other respects, the order is affirmed.  Each party shall bear its own costs on appeal.


MCINTYRE, J.

WE CONCUR:

BENKE, Acting P. J.

O'ROURKE, J.