Filed 11/12/25  Marriage of Manning CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| In re the Marriage of JAMES and BREANNE MANNING. | D084718 |
| JAMES MANNING,<br><br>    Respondent,<br><br>v.<br><br>BREANNE MANNING,<br><br>    Appellant. | (Super. Ct. No. 21FL009135C) |

APPEAL from an order of the Superior Court of San Diego County, Rebecca G. Church, Judge. Reversed and remanded with directions.

Breanne Manning, in pro. per., Dennis Temko and Erik Jenkins for Appellant.

Cage & Miles and John T. Sylvester for Respondent.

Appellant Breanne Manning appeals a family court order denying her request for $250,000 in attorney fees and $50,000 in expert costs from

respondent James Manning[1] to pay for future proceedings in their dissolution action. The family court, despite finding a disparity in income and access, denied the request, ruling it was unreasonable based on the parties' litigation history, the support Breanne had been receiving, the past attorney fee payments made to her, her unreasonable litigation tactics and the fact Breanne had admitted committing perjury in a past declaration. Breanne contends the court abused its discretion by this ruling in part because there was not substantial evidence or legal justification to use her past conduct or asserted perjury to deny her fees; the order contravened Family Code[2] section 2030 by failing to assess Breanne's prospective needs or ability to pay; it did not use alternate means, such as sanctions, to address her misconduct; and it was not specific as to what fees were attributable to her misconduct. Breanne maintains she was prejudiced under the standards expressed in *In re Marriage of Morton* (2018) 27 Cal.App.5th 1025 (*Morton*). We reverse that part of the court's order denying attorney fees and remand with directions stated below.

FACTUAL AND PROCEDURAL BACKGROUND

The parties were married for a little over 12 years and have one child. They entered into a prenuptial agreement on the day of their marriage. James had considerable separate property assets and income before the marriage from successful businesses, and the parties maintained a high standard of living during the marriage.

---

[1]    As is customary, we refer to the parties by their first names for clarity and intend no disrespect.

[2]    Undesignated statutory references are to the Family Code.

2

In June 2021 James petitioned for dissolution. In March 2022, based on a settlement agreement,[3] James paid Breanne $5,000 a month in support, and an equalizing payment of $150,000. In March 2023, the family court ordered James to pay Breanne $11,668 per month in interim child and spousal support. In April 2023, James was ordered to pay Breanne $40,000 in section 2030 attorney fees and make a $10,000 contribution toward her expert fees.

During and particularly toward the end of their marriage and just after their separation, James had issues with alcoholism and physical aggression toward Breanne. However, he had since made efforts to become sober, accepted responsibility for pain and harm he caused due to his addiction, and committed to never drink again.

*Prior Proceedings*

Following the filing of the dissolution petition, Breanne filed two requests for domestic violence restraining orders, one in July 2022 which resulted in issuance of a temporary restraining order, and another in June 2023. Before obtaining the temporary restraining order, Breanne's attorney asked James for $1 million to not go forward with it. James opposed Breanne's June 2023 request, denying he was abusive and explaining that the issues would be addressed in an upcoming custody/visitation trial scheduled in August 2023.

On various days in June, July and August 2023, the parties underwent trial before Judge Pamela M. Parker on Breanne's July 2022 and June 2023

---

[3]     The family court ultimately found that settlement agreement unenforceable for the parties' failure to exchange preliminary declarations of disclosure before signing. Breanne later testified she did not return the $150,000 after the court invalidated the agreement, as she had used it for legal fees.

requests for permanent domestic violence restraining orders and James's request for specified custody and visitation orders.

While these proceedings were taking place, Breanne in July 2023 sought orders for a $200,000 predistribution of community property, to declare the parties premarital agreement invalid, and that James pay $5,000 in attorney fees as sanctions.

In early October 2023, Judge Parker issued findings and an order after hearing on the parties' domestic violence restraining order and custody trial. The court dismissed one of Breanne's domestic violence restraining order requests on grounds James had not committed further acts of domestic violence, and denied the other request for a permanent domestic violence restraining order. In detailed findings recounting Breanne's assertions as well as addressing the parties' credibility, the court mostly rejected Breanne's claims, finding she had not shown James had committed acts of domestic violence against her or their son since September 2022, and thus had not shown such an order was necessary to prevent further violence.

On October 25, 2023, the family court, Judge Judy Bae, conducted a hearing on Breanne's July 2023 request for predistribution of community property.[4]

Following Judge Parker's ruling, Breanne on October 31, 2023, filed another request for order, this time asking for a $250,000 predistribution of community property, backpay and recalculation of support, and $75,000 in attorney fees and costs.

In December 2023, Judge Bae ruled on Breanne's July 2023 requests for sanctions and preliminary distribution of $200,000 in community

---

[4]    James later stated in a sworn declaration that Breanne had amended her July 2023 request to seek a $50,000 contribution toward her attorney fees but withdrew that new request at the hearing.

property.  The court denied without prejudice those requests, finding as to the sanctions request that the validity of the prenuptial agreement was a "valid issue that is in dispute," and as to the preliminary distribution that "it did not appear that that sum was tied to any asset or means in which the Court could determine that that is a sum in which [Breanne] would be entitled to, other than what the Court took to be a conclusory statement in her declaration."  The court set the issue of the premarital agreement's validity for trial.

In January 2024, Breanne filed yet another request for a $250,000 pre-distribution of community property funds, modification of child and spousal support, and $120,000 in attorney fees and costs.  By then, Breanne had assertedly incurred over $220,000 in legal fees and costs and still owed her attorneys over $94,000.  In an accompanying income and expense declaration, Breanne listed zero income, $808 in accounts, and "unknown" liquid assets. She wrote that the value of her real and personal property was to be determined ("TBD").  She listed over $12,000 in monthly expenses.

The following month, Breanne, represented by new counsel, filed an emergency application to shorten time for her attorney fee request, so as to pay her lawyer for the upcoming trial.  The court denied it for the absence of an emergency under court rules or the Family Code.

*Breanne's March 2024 Fee Request*

In March 2024, Breanne filed another request for an order of $200,000 in attorney fees and $50,000 in costs for an expert.[5] She represented that there was a large disparity in income between the parties; James had the resources to continue paying his own attorney fees, and he had an unfair advantage due to his financial resources.

James opposed Breanne's request, agreeing that the case had been heavily litigated but claiming most of the costs were from Breanne's challenge of every legal agreement she had entered into with him. He accused Breanne of acting in bad faith in that she had received significant assets ("exclusive use of a [$3,000,000] house") and funds ("$150,000 plus a $40,000 attorney fee award and a $10,000 expert fee award, along with ongoing monthly child and spousal support"), but refused to engage in settlement discussions or respond to settlement offers.

---

[5] At oral argument in this matter, Breanne's counsel represented that this request was for $250,000 in attorney fees, including $50,000 in past fees and $200,000 in prospective fees. The record shows that in her Judicial Council form request, Breanne asked for $200,000 in fees, and $50,000 in costs. In it, Breanne stated she "needs [James] to contribute to her attorney's fees *in order to continue efforts to resolve this matter*." (Italics added.) Breanne's declaration submitted with her request states she was seeking $250,000 in fees "in order to assert her rights under the Family Code" and $50,000 "so that [she] can pay an expert forensic accountant," without specifying whether she sought contribution for past fees. Breanne's attorney's declaration in support of the request, filed on March 1, 2024, discussed the "services that I expect to render" in the case, then asked for a $250,000 contribution ($200,000 in attorney fees and $50,000 for an expert) under the heading: "FUTURE ANTICIPATED FEES."

6

During the pendency of Breanne's fee request, Judge Parker in April and May 2024 conducted another trial, this time on the validity of the parties' prenuptial agreement.

In May 2024, during the trial proceedings on the prenuptial agreement, Breanne filed another income and expense declaration in support of her request for attorney fees and other payments. This time, she identified her employment in sales and her employer as a sauna studio, which paid her $16.85 per hour, 10 to 15 hours per week, though she represented those hours were "not guaranteed." She identified approximately $2,200 in accounts, but claimed other assets were "unknown." She declared over $18,000 in monthly expenses. Breanne stated she had paid her counsel over $225,000 in fees and costs.

James filed his own income and expense declaration. It reflected estimated average monthly self-employment income of $47,500 and $25,124 in investment income. He claimed $350,000 in accounts, over $10 million in liquid assets, and $9 million in real and personal property. He identified over $74,400 in average monthly expenses. James represented he had paid his attorneys $460,130 in fees and costs and still owed them $16,857. He stated that Breanne's attorney fees could be paid from the support he had paid, his prior $150,000 payment, the May 2023 $40,000 payment and an additional $30,000 he had paid Breanne in April 2024.

In a sworn declaration opposing Breanne's fee request, James asserted Breanne was cohabitating with a boyfriend who paid some of her household expenses and possibly paid her other income from a business they operated together. He asserted that Breanne was falsely claiming to no longer be with the boyfriend, who he felt was complicit in efforts to "fool" the court. James pointed to evidence that Breanne received rental income: $1,654.09 for nine

rental days in February 2024; he claimed she had received and would continue to receive income from renting an accessory dwelling unit (ADU) on the property where she was living.

James disputed the level of the marital standard of living that Breanne had claimed,[6] and stated Breanne had marketable skills as a seamstress or in computer aided design and could work in event planning. He characterized Breanne as having acted in "bad faith," asserting she had filed a request for a predistribution and sanctions in July 2023, amended the request the same day to ask for more attorney fees, then waited to serve the amended request until October 3, 2023, 16 court days before the October 25, 2023 hearing, forcing him to incur additional fees in amending his declaration. He asserted that Breanne did the same thing when filing her October 2023 request for order. He pointed out that at trial on the prenuptial agreement, Breanne testified her former attorneys had waived the balance owed in response to Breanne's threat to report them to the state bar.

James also asserted that Breanne had challenged every legal agreement they had entered into, including their premarital agreement, as well as "nearly every court order" issued in their matter. He asserted that the "true amount of support" he paid Breanne, apart from the $8,114 in spousal support, was $9,576 for the fair rental value of the $3 million home he had purchased for Breanne to live in, as well as $2,503 in property taxes,

6    James characterized the parties' standard of living as "comfortable." He stated he owned two properties, his San Gorgonio residence worth approximately $8 million with a $2 million mortgage, and the residence Breanne lived in, worth approximately $3 million with no mortgage. He stated he "came into the marriage with significant separate property assets, including $12 [million] in his investment account and an estimated $27 [million] worth of business interests." He contended "that any community property earned during the marriage was exhausted by the living expenses of the parties."

$2,447 in estimated insurance and extra renters' insurance for that property, $976 monthly insurance and registration for a Range Rover vehicle, and $1,527 for the Range Rover's monthly lease. He stated: "lf we add in the court-ordered child support amount of $3,554 per month, and the average monthly cost of [their son's] private school of tuition of $2,486, [Breanne] is receiving the benefit of $31,183 per month that I am paying on her/[their son's] behalf, which equates to $374,196 per year (which is over half of my pass-through income for 2022!)[.]"

James stated that he had been ordered to pay Breanne $70,000 toward her attorney fees and costs to date, but argued the court should not order another contribution, contending Breanne's "litigation tactics have been frivolous and unnecessary" and pointing out she "has testified that her attorney has waived her outstanding balance of over $100[,000]." He stated: "I should not have to contribute additional fees so [Breanne] can wage this endless battle against me."

In May 2024, the parties began exercising joint physical custody of their son.

*June 2024 Evidentiary Hearing and Family Court's Ruling*

In June 2024, the family court, Judge Rebecca Church, conducted an evidentiary hearing on Breanne's requests for orders. In doing so, the court stated it had reviewed Breanne's original October 31, 2024 request, her amended January 2024 request, and her March 2024 request. The court considered the parties' updated May 2024 income and expense declarations. It stated it had reviewed August and December 2023 orders, including on Breanne's requests for domestic violence restraining orders.

The court also stated it had considered James's trial brief filed in advance of the hearing. In that brief, James argued that most of the assets

9

were his separate property, although he conceded that "two major assets were purchased/created during the marriage," namely his San Gorgonio residence and "the primary income-producing business, JMAC Plumbing & Air Conditioning." James conceded that "characterization of assets, ascertaining reimbursement claims, and valuing the community's interest in his business, are all trial issues" and that it was premature to order a division of assets *pendente lite* without the ability to investigate their value and identify the community assets. He pointed out the court had not yet decided the validity of the parties' premarital agreement.

Both Breanne and James testified. Breanne testified she currently owed her prior attorney $141,000 and had negotiated the potential forgiveness of those fees but claimed that the attorney's offer was revoked. She testified she did not believe James had been forthcoming with his financial disclosures, based on his prior statements to her that he was worth $50 to $60 million. She testified his numbers were low compared to their lifestyle and what he had claimed. Breanne admitted on cross-examination to lying in her July 2023 declaration about an attorney's involvement in a prenuptial agreement and blaming her former counsel for it but failing to correct it until May 2024. She admitted her attorney had asked James to pay $1 million in exchange for her not going forward with the first temporary restraining order. Breanne denied living with the individual she had dated, though she agreed volunteering for his business, producing advertising content. She testified their relationship had ended and after that point she began to be paid for her marketing efforts. Breanne agreed a vocational evaluation conducted in June and July 2023 had concluded she could have a full time job within four to five months. Though she acknowledged her and James's recent joint child custody arrangement gave her an ability to work

10

more than 10 to 15 hours per week, she claimed to have no time to do so because of the litigation.

Breanne lived in a Point Loma property that James's trust purchased for $2.4 million. She paid no mortgage, insurance or taxes on the property; those expenses were all paid by the trust, which owned it. Breanne testified that in August 2022 to October 2022, with the assistance of her then boyfriend, she rented out an apartment above her garage and received $35,000, amounting to $11,667 per month. Her attorney told her to stop renting it due to an insurance issue. James eventually obtained extra insurance for the property. She began renting it out again in 2024, after her attorney advised her she needed to do so.

Breanne testified about her May 2024 income and expense declaration's statement that she received rental income for a 12-month average of $1,440.38. She agreed her monthly average was probably higher however, as she had only been renting the property from February 2024 to the time of the June 2024 hearing. She also testified about the assertion that she earned an average of $448 per month in "PPD income," stating she could not recognize what that was, but thought it was the rental income. She admitted she did not review her income and expense declaration thoroughly enough before signing it. Breanne admitted the parties did not presently have a community property account.

In closing arguments, Breanne's counsel explained that aside from the prenuptial agreement, there remained complex issues relating to apportionment, characterization and reimbursements, as well as "significant tracing issues." Counsel asked for $50,000 to hire a forensic expert in addition to the $10,000 ordered in March 2023, as well as a $250,000 attorney fee contribution so that Breanne could continue to litigate the case.

11

He represented that Breanne would "concede that the Court construe my client's circumstances in a way most favorable to [James's] position as taken in his trial brief" such that the court could accept his represented income and impute 40 hours of work per week for Breanne, giving her $2,920 in monthly W-2 income. He conceded $9,576 in monthly rental value for the residence Breanne lived in, as well as $2,100 in taxable monthly rental income.

*Judge Church's Ruling on Breanne's Fee Request*

The court issued its ruling from the bench. On Breanne's attorney fees and costs request, it found "there clearly is a disparity in income." It stated: "[W]hen I am looking at the disparity in access, I am looking at historically over the period that this has been litigated, now that there's a long period that it's been litigated, the amounts of support[ ] that [Breanne] has been receiving at that time.

"And I also have to consider the litigation tactics in this matter and well—as well as whether or not those requests are reasonable. There's been sizeable payments as to attorney's fees up until this point.

"The litigation tactics are unreasonable in this case. It is an unreasonable use of the existing funds. The [domestic violence] restraining order hearing, there were adverse credibility determinations. There was the court noting some meritless allegations. There were clearly impacts on the minor child with insufficient credible evidence that the minor child's safety would be at risk if there was a permanent restraining order [*sic*].

"So in addition to that, there is the fact of the admission as to perjury in some declarations. That increases litigation. There was a long time in which it could have been corrected. It was not corrected. And it is a course of litigation positions which were unreasonable, which drove up the attorney's fees for which there is now this request for the attorney's fees.

12

"So I am denying it in total.  I am denying the request for attorney's fees based on those grounds.  It is unsupported as a reasonable request based on the way that this case has proceeded.  And, therefore, those funds certainly were not and can't be counted as necessary funds."[7]

*Judge Parker's Ruling on the Parties' Prenuptial Agreement*

Days after Judge Church's ruling, Judge Parker issued lengthy findings and an order after hearing on the parties' prenuptial agreement, ruling James had proven Breanne signed the agreement voluntarily, freely and with knowledge of the relevant facts.  In supporting findings, Judge Parker recounted that after being advised of her Fifth Amendment rights, Breanne had acknowledged under oath that a declaration she had filed in support of her request was in "key respects . . . , untrue" and that Breanne stated she had done so despite knowing it was false because her attorney told her to do it.[8]  The court further observed that while documentation was "scant" and

---

[7]    The court also denied without prejudice Breanne's request for a predistribution of community funds on the same grounds as before, ruling it did not appear the sums were tied to any asset or means in which the court could determine the sum to which Breanne would be entitled.  It modified child support based on material changes in the parties' income, as well as Breanne's receipt of rental income, which Breanne had not previously conceded.  The court also modified spousal support based on James's significant payments toward insurance and Breanne's vehicle, which were not reflected in the prior support order, and Breanne's ability to earn a full-time wage.

[8]    According to Judge Parker, "[t]hese inaccuracies include: that the agreement was executed the day ***before*** the wedding; that the attorney present for the signing was Henry Lichtenberger, that it was Mr. Lichtenberger who threatened [Breanne] that if she did not sign there would be no wedding (not [James]); and that she had ***never*** seen any 'actual

memories faded, James's "version is more consistent with the little documentation that does exist, and with the testimony of the witnesses." It found Breanne's version "changed midstream, and was punctuated at the last possible moment by a chaotic turn of events that [James] had no advance notice of, and had little opportunity to absorb, let alone provide a response to, involving no less than allegations of extremely serious professional misconduct and ethical lapses on behalf of [Breanne's] prior attorney . . . ." The court found Breanne's credibility "could not recover" from her "untimely and chaotic presentation of her new evidence . . . ." It found incredible other aspects of Breanne's testimony—including her portrayal of herself as a weak and helpless individual in her and James's relationship— and her allegations "characteristic of her tendency to blame everyone else for the state of affairs in her life and accept virtually no responsibility for her own actions or inactions." The court found alternatively that the agreement was enforceable

---

evidence' of [James's] finances." The court stated: "Although [Breanne] later repudiated her opening declaration, at no point before the [premarital agreement] hearing did [Breanne] expressly withdraw that original declaration or explain its inaccuracies, even in the face of [James's] responding declaration. Rather, in her Reply declaration, the 'day before the wedding' became 'the day of the wedding.' [Breanne] only referred generally to going to an attorney's office, and not to Mr. Lichtenberger by name. [Breanne] claimed at this point that she did not recall who the other person was in the room. Yet she still claimed there was no notary and that she and [James] signed at the same time." Under Penal Code section 118, a person is guilty of perjury if he or she "willfully states as true any material matter which he or she knows to be false." (Pen. Code, § 118, subd. (a); see also *Kinsella v. Kinsella* (2020) 45 Cal.App.5th 442, 463.) Thus, perjury requires a showing that the statement involve a material matter. (*People v. Lucero* (2019) 41 Cal.App.5th 370, 406 ["The elements for the crime of perjury are: (1) a willful statement, (2) the statement was made under oath or affirmation, (3) the statement involved a material matter, and (4) the witness knows the statement is false"].)

14

in equity because Breanne unreasonably delayed in challenging its enforceability, to James's "substantial prejudice. . . ."

*Breanne's Reconsideration Request of the Order Denying Attorney Fees*

Breanne applied ex parte for reconsideration of Judge Church's attorney fee order or alternatively an order shortening time on another request for order, arguing the outright denial of fees was inconsistent with statutory and case law. She argued the court had no discretion to deny a needs-based attorney fee request based on section 2030, and its consideration of litigation tactics was unsupported by the case law, which involved "tactics of the paying party, and much more extreme circumstances." Breanne argued the circumstances did not curtail the section 2030 requirements. According to Breanne, "the most crucial need [for her] is fees to pay an expert in hopes of obtaining enough information regarding potential community assets in order to reach a global settlement agreement and, of course, to pay an attorney to assist in concluding this matter—whether that be through settlement or trial."

In opposition, James asserted Breanne had not presented any new evidence. He also summarized a text message he had received that he said indicated Breanne had lied about no longer seeing her boyfriend.

The court denied Breanne's request for failing to show a legal emergency under court rules or section 3064. Breanne thereafter filed this appeal.

## DISCUSSION

### I. *Legal Principles and Standard of Review*

Sections 2030 and 2032 empower the family court to "award fees and costs between the parties based on their relative circumstances in order to ensure parity of legal representation in the action." (*In re Marriage of*

*Falcone & Fyke* (2012) 203 Cal.App.4th 964, 974; *In re Marriage of Hearn* (2023) 94 Cal.App.5th 380, 393.) "[T]he purpose of section 2030 is *not* the redistribution of money from the greater income party to the lesser income party. Its purpose is *parity*: a fair hearing with two sides equally represented. The idea is that both sides should have the opportunity to retain counsel, not just (as is usually the case) only the party with greater financial strength." (*Alan S. v. Superior Court* (2009) 172 Cal.App.4th 238, 251; *In re Marriage of Knox* (2022) 83 Cal.App.5th 15, 25.)

Subdivision (a)(1) of section 2030 limits fee awards to the amount "reasonably necessary" to maintain or defend the proceeding. Section 2030, subdivision (a)(2) provides: "When a request for attorney's fees and costs is made, the court *shall make findings* on whether an award of attorney's fees and costs under this section is appropriate, whether there is a disparity in access to funds to retain counsel, and whether one party is able to pay for legal representation of both parties. If the findings demonstrate disparity in access and ability to pay, the court *shall make an order* awarding attorney's fees and costs." (Italics added.) The making of the award and its amount must be "just and reasonable under the relative circumstances of the respective parties." (§ 2032, subd. (a).) Under subdivision (b) of section 2032, "[i]n determining what is just and reasonable under the relative circumstances, the court shall take into consideration the need for the award to enable each party, to the extent practical, to have sufficient financial resources to present the party's case adequately, taking into consideration, to the extent relevant, the circumstances of the respective parties described in Section 4320." And, "[t]he fact that the party requesting an award of attorney's fees and costs has resources from which the party could pay the party's own attorney's fees and costs is not itself a bar to an order that the

16

other party pay part or all of the fees and costs requested.  Financial resources are only one factor for the court to consider in determining how to apportion the overall cost of the litigation equitably between the parties under their relative circumstances."  (§ 2032, subd. (b).)

In making attorney fees awards under this statute, family courts must comply with these mandatory provisions; findings must be "explicit" and it is no longer the case that fee awards in these circumstances are left to the family court's "sound" or "broad" discretion.  (*Morton*, *supra*, 27 Cal.App.5th at pp. 1049-1050; *In re Marriage of Knox*, *supra*, 83 Cal.App.5th at p. 25.)[9] "Pursuant to section 2030, subdivision (a)(2), if the mandatory 'findings demonstrate disparity in access and ability to pay, the court shall make an order awarding attorney's fees and costs.' " (*Morton*, at p. 1053.)  But the court's failure to make explicit findings is reversible error only if it causes prejudice: that is, if "there is 'a reasonable probability that in the absence of the error, a result more favorable to the appealing party would have been reached.' " (*Morton*, at p. 1051.)

---

[9]    *Morton* explained:  "The version of section 2030 enacted in 1993 stated the trial court 'may . . . order' attorney fees in certain circumstances.  [Citation.]  The 2004 amendment deleted the word 'may' and inserted text that used the word 'shall' four times.  [Citation.]  The 2010 amendment modified section 2030, subdivision (b) to include text stating 'the court shall make findings' and stating 'the court shall make an order awarding attorney's fees and costs' if the findings demonstrated certain conditions.  [Citation.]  The textual changes made by the 2004 and 2010 legislation demonstrate that the discretionary authority granted to trial courts is not as broad as it once was and, currently, trial courts must comply with certain mandatory provisions."  (*Morton*, *supra*, 27 Cal.App.5th at p. 1049.)  "[T]he 'broad discretion' referred to in judicial decisions discussing the version of section 2030 predating the 2004 and 2010 amendments no longer exists."  (*Ibid*.)

This court reviews the family court's ultimate decision for abuse of discretion (*In re Marriage of Nakamoto & Hsu* (2022) 79 Cal.App.5th 457, 469 (*Nakamoto*)), but assesses its factual findings under the deferential substantial evidence standard. (*In re Marriage of Knox, supra*, 83 Cal.App.5th at p. 25, citing *Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711.) As the appellant, Breanne bears the burden of demonstrating error. (*Nakamoto,* at pp. 474-475.)

II. *Claim That Judge Church Failed to Make Express Findings*

At various points in Breanne's opening brief, she contends that in reaching the decision to not award her any attorney fees, Judge Church failed to make express mandatory findings under section 2030, specifically as to the parties' ability to pay.

We agree section 2030 requires a trial court to make express findings, i.e., "stated in words, either in writing or orally on the record," including as to "whether one party is able to pay for legal representation of both parties." (§ 2030, subd. (a)(2); *In re Marriage of Hearn, supra*, 94 Cal.App.5th at p. 393; *Morton, supra*, 27 Cal.App.5th at p. 1050.) Such findings may not be implied. (*Morton*, at p. 1050.) And, "[p]ursuant to section 2030, subdivision (a)(2), if the mandatory 'findings demonstrate disparity in access and ability to pay, the court shall make an order awarding attorney's fees and costs.'" (*Morton,* at p. 1053.)

James argues that the court "fully satisfied its obligation." He acknowledges section 2030's mandatory language, but maintains that "'ability to pay' is necessarily a component of the finding concerning 'disparity in access.'" Thus, he points out Judge Church "made express findings on each party's income and expenses. . . . And based on those findings it determined that there 'clearly is a disparity in income.' . . . And

18

when considering the disparity, the court considered that the case had been litigated for a long period." James says the court's findings that Breanne "had been receiving support the entire time" as well as its consideration of the fact "there had already been 'sizeable payments as to attorney's fees up until this point' . . . satisfied its obligation under section 2030." James argues, "Although [the court] determined a disparity it existed [*sic*], it found the request was nevertheless unreasonable based on [Breanne's] past litigation abuse."

We cannot agree with James's reasoning. Section 2030's language is clear about the "three specific questions" (*Morton, supra*, 27 Cal.App.5th at p. 1050) requiring express findings. Given the statutory language, the finding as to ability of one party to pay cannot be subsumed into the other inquiries concerning disparity in access or the propriety of a fee award. Accordingly, we hold the trial court did not make the required express findings on the parties' ability to pay, either at the hearing or in its findings and order after hearing.

Nevertheless, as stated, failure to make such findings does not, standing alone, require reversal of the family court's order. (*Morton, supra*, 27 Cal.App.5th at p. 1051.) Breanne must establish that the error was prejudicial by demonstrating a reasonable probability that she would have obtained a more favorable result in the absence of the family court's error. (*Ibid.*; Cal. Const., art. VI, § 13; *Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 800.) " '[A] "probability" in this context does not mean more likely than not, but merely a *reasonable chance*, more than an *abstract possibility*." (*Cassim,* at p. 800, quoting *College Hospital Inc. v. Superior Court* (1994) 8 Cal.4th 704, 715.) We turn to that question.

19

### III.  *Breanne Was Prejudiced by The Court's Errors*

Applying the above-referenced standard, we cannot say the family court's error in omitting findings was harmless.  It is appropriate in assessing the impact of the court's failure to make mandatory findings whether it otherwise engaged in a proper analysis on the attorney fee question.  Importantly, as we have explained, after the amendments to section 2030 in 2010, the family court's discretion in this inquiry is curtailed; "it is no longer accurate to refer to a trial court's 'broad discretion' when describing a trial court's responsibilities under section 2030 as currently in effect."  (*Morton, supra*, 27 Cal.App.5th at p. 1049; *In re Marriage of Knox, supra*, 83 Cal.App.5th at pp. 24-25.)  The statute requires that the court "shall ensure that each party has access to legal representation, *including access early in the proceedings*, to preserve each party's rights by ordering . . . one party . . . to pay the other party, . . . whatever amount is reasonably necessary for attorney's fees and for the cost of maintaining or defending the proceeding *during the pendency of the proceeding*.  (§ 2030, subd. (a)(1), italics added; see also *Knox,* at p. 28.)

We conclude the family court included improper factors in reaching its decision on Breanne's request for section 2030 attorney fees, and absent those factors, it is reasonably probable it would reach a different decision.  At this stage, Breanne's past litigation efforts or "tactics" were not a proper consideration.  Breanne's request was for pendente lite attorney fees: preparatory to *future* proceedings.  She was not asking James to contribute to fees she had already incurred and paid, and thus the court was not assessing the reasonableness and necessity of those fees.  And James admitted before the evidentiary hearing to the existence of valuable assets purchased or

created during the marriage—his $8 million residence as well as his income producing business—that would be subjects for a later trial on their characterization and reimbursement claims. On this record, it cannot be said there are not upcoming proceedings requiring the expenditure of attorney fees. There is no reason to conclude that in totality, a fee award is not reasonably necessary.

This distinguishes these circumstances from those in which courts— some applying the now defunct "broad discretion" standard—assessed the propriety or reasonableness of a sought-after section 2030 attorney fee award by viewing the parties' trial or litigation "tactics" *after* the conclusion of proceedings. (See, e.g., *In re Marriage of Huntington* (1992) 10 Cal.App.4th 1513, 1516, 1524 [upholding order denying attorney fees following trial in a short-term marriage case, reasoning in part based on prior law that "[t]he exercise of sound discretion by the trial court in the matter of attorney's fees includes also judicial evaluation of whether counsel's skill and effort were wisely devoted to the expeditious disposition of the case"]; *In re Marriage of Ciprari* (2019) 32 Cal.App.5th 83, 111-112 [reversing order denying any posttrial attorney fees to one party despite her having significant assets; court ruled the party could not be denied mandatory fees for requiring [her former husband] to trace his separate property and for incurring professional fees to review and litigate the issue]; *Nakamoto, supra*, 79 Cal.App.5th at pp. 468-472 [affirming order denying party's posttrial request for an additional $50,000 in fees incurred at trial on findings that party had over litigated the case and unnecessarily prolonged the trial, including by disputing the authenticity of certain signatures or translated documents; appellate court found no apparent "serious doubts about the authenticity of

the documents" and parties had stipulated to the translator, among other things].)

Further, that Breanne has her own assets with which to pay counsel does not preclude a pendente lite fee award. A party's " 'significant asset base from which to draw fees,' . . . is no bar to a need-based fee award. By mandatory consideration of the parties' relative circumstances, section 2032 authorizes a need-based fee award even if [a party] could pay her own attorneys' fees." (*In re Marriage of Ciprari, supra*, 32 Cal.App.5th at p. 111.) Likewise, that the court had previously ordered James to pay some of Breanne's attorney fees does not preclude a further award. (See *In re Marriage of Cryer* (2011) 198 Cal.App.4th 1039 1056 [" 'No single fees and costs order is an "all or nothing" proposition. Need-based awards may be *augmented or modified* as necessary during the entire pendency of the case, consistent with the parties' "relative circumstances' " "]; § 2030, subd. (c) ["The court shall augment or modify the original award for attorney's fees and costs as may be reasonably necessary for the prosecution or defense of the proceeding, or any proceeding related thereto, including after any appeal has been concluded."].)

The trial court referenced Breanne's lack of credibility, false and/or perjured declarations and conduct that "drove up the attorney's fees . . . ." But Judge Church did not explain the materiality of a single day difference in the date of signing the prenuptial agreement or the identity of counsel, and we see no basis in this record to conclude those inaccuracies amounted to perjury. Nor did Judge Church explain how these inaccuracies increased litigation and attendant expense. Actions tending to frustrate settlement or the expeditious resolution of the matter may be the basis for possible sanctions under section 271, but they are not proper considerations in

determining whether Breanne is entitled to a pendente lite attorney fee award. They do not involve issues concerning disparity of access and ability to pay. James is free to consider addressing Breanne's past litigation conduct by asking for section 271 attorney fees, which are not based on need, but whose purpose is to sanction " ' "conduct frustrating or obstructing the public policy [to promote settlement and to encourage cooperation that will reduce the cost of litigation] . . . ." ' " (*Menezes v. McDaniel* (2019) 44 Cal.App.5th 340, 349; *In re Marriage of Tharp* (2010) 188 Cal.App.4th 1295, 1316-1317.)

That said, we observe that some of the conduct that James complained of is not properly characterized as wasteful litigation tactics. For example, James argued Breanne "has routinely used the tactic of waiting exactly the mandated deadlines to serve her pleadings, despite her filing her pleadings well in advance of the hearing date." He complained that her attorney called in sick on the first day of the April 2024 trial, and did not notify his attorney until that morning, but that they were able to complete the trial in the two remaining days. We decline to find fault with counsel calling in sick or a party's use of court deadlines for service of papers, if in compliance with the Rules of Court.

Nothing we say condones dishonesty in litigation proceedings, or frivolous litigation efforts. However, section 2030 is clear: "If the [family court's] findings demonstrate disparity in access and ability to pay, the court *shall make an order* awarding attorney's fees and costs." (*Id.,* subd. (a)(2), italics added.) We emphasize that in making an award the court may limit the amount to what is reasonably necessary, and in making that determination, consider any factor the court deems just and equitable. (See *In re Marriage of Hearn, supra*, 94 Cal.App.5th at pp. 393-394 [that in determining a " 'just and reasonable' " amount of an award, the court may

consider " '[a]ny other factors the court determines are just and equitable' " under section 4320, subdivision (n)]; see also *Alan S. v. Superior Court, supra,* 172 Cal.App.4th at p. 255 [" 'Although application of the relative circumstances standard . . . may warrant a pendente lite fees and cost award, the *amount* is limited by a "*reasonably necessary*" standard.' "], quoting Rutter Group Family Law Treatise, *supra,* 5:184.1. pp. 5-79 to 5-80.)

DISPOSITION

The order denying Breanne section 2030 attorney fees is reversed and the matter remanded to the family court to make findings under section 2030 and otherwise conduct further proceedings to determine a reasonable award. In all other respects, the court's order is affirmed. Breanne shall recover her costs on appeal.

O'ROURKE, Acting P. J.

WE CONCUR:


DO, J.


BUCHANAN, J.